IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Stewart R. Buchanan, also known as Daphne Renee' Stewart, | ) ) ) | C/A No.: 1:21-385-DCN-SVH |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| JumpStart South Carolina; Michael Scharff; Daniel Sulton, Vice-Chairman, Bd. Of Dir., JumpStart South Carolina; Bob Caldwell; Sharon McDowell; Chris Phillips; Chuck Fields; Tommy Holt; Mike Kiriakides; Chris Urban; Tommy Moore; Carey Sanders; David Johnson; NFN Beard; Bryan Stirling; Larry Epps; Charles Williams; and Willie Davis, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | REPORT AND RECOMMENDATION AND ORDER |
| Defendants. | ) ) | |

An inmate sues prison officials and a Christian-based organization that provides a rehabilitation program within the prison system, alleging he lost his position in the program because of his transgender or homosexual status.[1] Both the prison officials and the religious organization members move for summary judgment, arguing Plaintiff's claims against them should be dismissed.

---

[1] Because Plaintiff refers to himself using male pronouns, the court does so as well.

Stewart R. Buchanan, also known as Daphne Renee' Stewart, ("Plaintiff"), proceeding pro se and in forma pauperis, filed this suit against JumpStart South Carolina ("JumpStart") and multiple members of that organization including Cary Sanders ("Sanders"), David Johnson ("Johnson"), NFN Beard ("Beard"), as well as members of JumpStart's board of directors (collectively "JumpStart Defendants"). Plaintiff additionally sues the following employees of the South Carolina Department of Corrections ("SCDC"): Bryan Stirling ("Stirling"), SCDC Director; Larry Epps ("Epps"), the SCDC senior chaplain at Perry Correctional Institution ("PCI"); PCI warden Charles Williams ("Williams"); and Willie Davis ("Davis") (collectively "SCDC Defendants"). Plaintiff asserts claims under 42 U.S.C. § 1985 and § 1986 for conspiracy to violate his civil rights, under 42 U.S.C. § 1983 for violations of his First and Fourteenth Amendment rights, and pursuant to South Carolina statutory and constitutional law. [ECF No. 1 at 4, 6, ECF No. 1-1 at 13–16].[2]

---

[2] Previously, the court construed Plaintiff as having asserted claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act"). [*See* ECF No. 44 at 2]. However, Plaintiff has clarified in briefing that he is not bringing claims based on Title VII or the Fair Housing Act. [*See* ECF No. 86-2 at 13 (citing ECF No. 1-1 ¶ 5), *see also* ECF No. 1-1 ¶¶ 51–61, ECF No. 99 at 2–3].

2

This matter comes before the court on the motions for summary judgment filed by SCDC Defendants and JumpStart Defendants. [ECF Nos. 74, 75]. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Plaintiff of the dismissal procedures and the possible consequences if he failed to respond adequately to the motion. [ECF No. 76]. The motions having been fully briefed [*see* ECF Nos. 86, 87, 92, 96], they are ripe for disposition. Also pending before the court is Plaintiff's motion for summary judgment [ECF No. 88] as well as his motions to compel and motion to appoint guardian ad litem [ECF Nos. 70, 71, 73].

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), the case has been assigned to the undersigned for all pretrial proceedings. Having carefully considered the parties' submissions and the record in this case, the undersigned denies Plaintiff's motions to compel and motion to appoint a guardian and recommends the district judge deny Plaintiff's motion for summary judgment and grant SCDC and JumpStart Defendants' motions for summary judgment.

I.    Factual and Procedural Background

A.    JumpStart Programs at PCI

South Carolina has established an Offender Employment Preparation Program, pursuant to which SCDC is directed as follows:

3

> To aid incarcerated individuals with reentry into their home communities of this State, the South Carolina Department of Corrections shall assist inmates in preparing for meaningful employment upon release from confinement. The South Carolina Department of Corrections shall coordinate efforts in this matter with the Department of Employment and Workforce, Department of Probation, Parole and Pardon Services, the Department of Vocational Rehabilitation, Alston Wilkes Society, and other private sector entities.

S.C. Code Ann. § 24-13-2110. SCDC is further directed to enter into a memorandum of understanding ("MOU") with participating entities. *See* S.C. Code Ann. § 24-13-2120 ("Each agency shall adopt policies and procedures as may be necessary to implement the memorandum of understanding."). The MOU is to establish the role of each agency in:

> (1) ascertaining an inmate's opportunities for employment after release from confinement and providing him with vocational and academic education and life skills assessments based on evidence-based practices and criminal risk factors analysis as may be appropriate;
>
> (2) developing skills enhancement programs for inmates, as appropriate;
>
> (3) coordinating job referrals and related services to inmates prior to release from incarceration;
>
> (4) encouraging participation by inmates in the services offered;
>
> (5) developing and maintaining a statewide network of employment referrals for inmates at the time of their release from incarceration and aiding inmates in the securing of employment;

(6) identifying and facilitating other transitional services within both governmental and private sectors;

(7) surveying employment trends within the State and making proposals to the Department of Corrections regarding potential vocational training activities.

S.C. Code Ann. § 24-13-2130.

The MOU entered into between SCDC and JumpStart provides in part as follows:

WHEREAS, SCDC is required to aid incarcerated individuals with reentry into their communities pursuant to Section 24-13-2110, et. seq. of the South Carolina Code of Laws of 1976, as amended; and

WHEREAS, Jumpstart provides certain services including discipleship, re-entry workshops, employment readiness activities, and other programs to assist incarcerated individuals prepare for and successfully reenter their communities; and

WHEREAS, SCDC desires, and Jumpstart agrees, to enter into this Memorandum of Understanding whereby Jumpstart shall provide services to eligible inmates within SCDC to help ensure a successful reentry for such inmates into South Carolina communities . . . .

Monitoring of Jumpstart services will be the responsibility of SCDC Chaplains at the facilities where the services are performed . . . .

Compliance with Rules and Regulations: JumpStart agrees that it and its volunteers and employees must comply with all policies and procedures of SCDC and all federal, state, and local laws, ordinances, regulations, and accreditation standards.

JumpStart employees/volunteers are not SCDC Employees: JumpStart employees/volunteers performing under this

5

Agreement are not to be deemed to be employees of SCDC nor as agents of SCDC in any manner whatsoever . . . .

[ECF No. 40-2 at 1–2].

JumpStart Defendants assert that JumpStart is a 501(c)(3) non-profit organization dedicated to restoring the lives of inmates on the inside and outside of prison by addressing the spiritual, educational, employment, healthcare, housing, and family relationship needs of current and former prisoners, and assisting with their re-entry into society. [ECF No. 21-1 ¶ 3].

JumpStart permits any inmate to participate in its inside ministry/discipleship program [ECF No. 75-1 ¶ 8], and only JumpStart's ministry as found within PCI is at issue in this case. However, Sanders, who was the inside program director for JumpStart during the relevant time period, attests that "JumpStart does expect the participants in the program to align their conduct with the Biblical teachings that drive the discipleship program," for example requiring as follows:

If you receive a major disciplinary or three minors during the JumpStart class, you will be removed from the program . . .

If you graduate at one level, but then fail to maintain a life of faith and character at the same level, you will be reassessed concerning whether you will be accepted into JumpStart housing.

[ECF No. 75-1 ¶¶ 3, 8–9, 13, *see also* ECF No. 99-4 (JumpStart "Getting My Life In Order" booklet)].

6

According to SCDC chaplain Epps, "[a]round 2016 or 2017, Jumpstart implemented a policy whereby if an inmate desired help with housing or employment upon release, such assistance was conditioned upon the inmate being a professing and practicing Christian by the end of the program." [ECF No. 74-15 ¶ 15]. Epps describes JumpStart as being "a very unique program" and "privately funded." *Id.* ¶ 14. JumpStart is one of multiple organizations that Epps has worked with at PCI, and Epps estimates he has "helped between ten to thirty inmates per year locate housing and/or employment, or both," working "with the inmates to find a good fit" between them and the various programs. *Id.* ¶¶ 7, 10, 12.

According to Plaintiff, SCDC real estate is made available to JumpStart, "including buildings, seating for over 100, podiums, desks, tables, microphones and stands, amplifiers, speakers, conference rooms, telephones, computers, printers, volunteer inmate labor . . . ." [ECF No. 1-1 ¶ 32].[3]

B.    JumpStart Discipleship Program

Plaintiff was transferred to PCI on January 16, 2018. [ECF No. 74-2 at 1]. Shortly thereafter, he voluntarily applied and was accepted into JumpStart's 2018 discipleship program. [ECF No. 75-1 ¶¶ 6–7; ECF No. 75-2

---

[3] In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

¶¶ 7–8]. Plaintiff alleges that Epps approved him to participate in the program, but Epps attests he was not involved in the decision. [ECF No. 1-1 ¶ 34, ECF No. 74-15 ¶ 17]. Plaintiff describes the program as "a rigorous, forty (40) week, Christian religious character litmus test." [ECF No. 1-1 ¶ 29].

Plaintiff completed the JumpStart discipleship program in late 2018. [ECF No. 75-1 ¶ 14; ECF No. 75-2 ¶ 9]. He graduated with a "blue" folder, which is the highest assessment a participant can receive. *Id.* JumpStart Defendants assert that Plaintiff was one of the highest-performing participants in the 2018 program. *Id.* Although Plaintiff states that Epps decided Plaintiff would graduate "at the very top of the class" [ECF No. 1-1 ¶ 34], Epps attests that he was on a committee and provided one of many votes in support of Plaintiff's "blue folder" status. [ECF No. 74-15 ¶ 18].[4]

JumpStart Defendants have submitted evidence that "JumpStart does not begin the process of thoroughly evaluating an inmate for participation in JumpStart's post-release housing or employment programs until the inmate's release is certain and imminent." [ECF No. 75-1 ¶ 35, *see also id.* ("Based on Buchanan's current status, JumpStart has not yet evaluated his application for housing and will not do so unless and until it appears as though he will be

---

[4] JumpStart Defendants have submitted evidence that "[r]eceiving a blue folder does not entitle a participant to anything—it simply means the participant has passed the program with the highest level of assessment." [ECF No. 75-1 ¶ 15; ECF No. 75-2 ¶ 10].

released.”); ECF No. 74-15 ¶ 11 (“In light of the number of prisoners who are unsuccessful in their bids for parole, it would be an incredible waste of time and resources to try to line up transitional services prior to an inmate being granted parole.”)].

Plaintiff, however, alleges Johnson appeared before the South Carolina Parole Board on November 13, 2018, to represent Epps's decision that, if paroled, Plaintiff would be guaranteed employment and housing by JumpStart. [ECF No. 1-1 ¶ 35].[5] Plaintiff was denied parole. *Id.*

C.    JumpStart Leadership Program

After successfully completing JumpStart's discipleship program, Plaintiff voluntarily requested to participate in JumpStart's leadership

---

[5] Plaintiff has submitted evidence of an excerpt from his psychological evaluation presumably related to a parole hearing, in which Epps represented to the psychologist as follows:

> He stated that if Mr. Buchanan makes parole, “I get the housing packet for JumpStart, I do that, I will let them know they have a blue folder coming.” This means JumpStart would expect Mr. Buchanan to take a leadership role in the house and in the organization. Chaplain Epps had also reached out to “retired pastor” Frank Ledvinka about Mr. Buchanan. Pastor Ledvinka indicated to him that he wanted to offer Mr. Buchanan a “full time ministry” opportunity if released.

[ECF No. 1-3 at 40]. Plaintiff argues “[i]t is common knowledge at Perry CI that if Chaplain Epps does not approve of one's lifestyle since graduation, they will not have any folder coming.” [ECF No. 88-2 ¶ 8]. Plaintiff also states “Epps has and uses the authority to make all final decisions as to who is denied employment and housing opportunities.” [ECF No. 1-1 ¶ 33]. Epps denies he has any involvement in these decisions. [ECF No. 74-15 ¶ 16].

training program. [ECF No. 75-1 ¶ 17; ECF No. 75-2 ¶ 12]. If an inmate successfully completes the leadership training program, the inmate is eligible to serve as a peer leader/coach of a small group of participants in subsequent JumpStart classes. [ECF No. 75-1 ¶ 18; ECF No. 75-2 ¶ 13]. This is an unpaid, volunteer position. *Id.*

In February 2019, Plaintiff began serving as a peer leader/coach of a small group of participants in the 2019 JumpStart discipleship class. [ECF No. 75-1 ¶ 20; ECF No. 75-2 ¶ 14]. Plaintiff alleges Epps "employed Plaintiff as a 'Coach'" [ECF No. 1-1 ¶ 34], although Epps attests he was not involved in any decision related to Plaintiff's attaining this position. [ECF No. 74-15 ¶ 19]. Plaintiff alleges his job performance continued to exceed minimum requirements and his personal ministry expanded to providing Sunday School and visitation for PCI's handicapped in the assisted living unit until Epps learned that Plaintiff lived openly as transgendered between 2004 and 2008. [ECF No. 1-1 ¶ 36].

D.    Plaintiff's Version of Events Regarding his Removal from the JumpStart Programs

According to Plaintiff, his good friend, John William Duncan ("Duncan"), was transferred to PCI on January 31, 2019; Plaintiff states he and Duncan had known each other since 1973, indicating they had previously had a close relationship. [ECF No. 88-2 ¶ 3]. After Duncan's arrival, Plaintiff

alleges he began to spend time with Duncan, and "[t]hat is what drew Defendant Epps' attention and brought to him the previously untold story that I am a male to female transgender individual." *Id.* ¶ 4.

During this time, it appears the parties agree that Epps had been allowing Plaintiff to use the PCI chaplaincy offices and equipment for Plaintiff to assist Torian Ware ("Ware"), PCI's institutional coach or recreation specialists, although the parties disagree whether this was a prison job or volunteer assignment. [*See* ECF No. 1-1 ¶ 36, ECF No. 74-15 ¶¶ 21–22]. The parties do agree, however, that Epps banned Plaintiff from using the PCI chaplaincy offices and equipment, with Plaintiff arguing it was because Epps found out about his previous transgendered status and Epps asserting it was because of ongoing problems with Plaintiff's attitude. [ECF No. 1-1 ¶ 36, ECF No. 74-15 ¶¶ 21–27].

Plaintiff alleges that thereafter, on February 24, 2019, he filed an American with Disabilities ("ADA") discrimination claim against Epps, but was informed that the ADA does not address sex discrimination. [ECF No. 1-1 ¶ 37, *see also* ECF No. 74-10 (Plaintiff's complaint dated February 24, 2019, stating "I claim a disability due to [a diagnosis of] Unspecified Gender Dysphoria, by History. I have suffered, and continue to suffer, workplace discrimination of a very vicious character by Chaplain Larry Epps as a direct

and proximate result of my disability")]. Plaintiff alleges he was in Epps's office the next day when SCDC chief chaplain Michael Brown telephoned to advise Epps that Plaintiff had filed a civil rights complaint against him. [ECF No. 1-1 ¶ 39].[6]

Plaintiff alleges on March 13, 2019, Johnson and Beard summoned Plaintiff to the PCI chaplaincy office, and the following interaction occurred:

Johnson:    Steward, I understand you identify as transgender.

Plaintiff:    I have been diagnosed with Gender Identity Disorder, but I identify as a Christian.

Johnson:    It's all about appearances, Steward, all about appearances. And you've filed a complaint in Columbia against Chaplain Epps, so you'[v]e defied spiritual authority . . . . I just got off the phone with [Sanders] and he told me to let you know you have one of two choices—you can go through JumpStart again, or you can walk out the door.

*Id.* ¶ 41. Plaintiff alleges he contacted Sanders on December 10, 2019, who refused to reverse the March 13, 2019 decision. *Id.* ¶ 42. Plaintiff then appealed Sanders' refusal to Epps, who also refused to reverse the March 13, 2019 decision. *Id.* ¶ 43. Finally, Plaintiff alleges he notified the following

---

[6] Plaintiff also states that on February 25, 2019, associate warden Susan Duffy "advised Defendant Epps of his potential liability and recommended he speak to Plaintiff" and that a meeting that took place on March 13, 2019, where Epps, Johnson, and Beard discussed Plaintiff's transgender status [ECF No. 1-1 ¶¶ 38, 40]. However, there is no indication that these assertions are based on Plaintiff's personal knowledge and are therefore inadmissible for summary judgment purposes.

JumpStart Defendants about the situation, receiving no response: Michael Scharff ("Scharff"), Daniel Sulton ("Sulton"), Bob Caldwell ("Caldwell"), Sharon McDowell ("McDowell"), Chris Phillips ("Phillips"), Chuck Fields ("Fields"), Tommy Holt ("Holt"), Mike Kiriakides ("Kiriakides"), Chris Urban ("Urban"), and Tommy Moore ("Moore") (collectively, "JumpStart board members"). *Id.* ¶ 46.

E. JumpStart's Version of Events Regarding Plaintiff's Removal from the JumpStart Programs

JumpStart Defendants have put forth evidence that in early March 2019, JumpStart discovered that Duncan was a member of Plaintiff's small group. [ECF No. 75-1 ¶ 21; ECF No. 75-2 ¶ 15; *see also* ECF No. 74-15 ¶ 28]. JumpStart does not permit any peer leaders/coaches to have inmates in their small groups with whom the peer leader/coach has a close relationship or has a negative relationship. [ECF No. 75-1 ¶ 22; ECF No. 75-2 ¶ 16]. Johnson reached out to Sanders to discuss how to best resolve the potential conflict of interest. [ECF No. 75-1 ¶ 23; ECF No. 75-2 ¶ 17]. Johnson and Sanders agreed the appropriate solution would be to move Duncan to a different small group with a different peer leader/coach. *Id.*

JumpStart Defendants agree with Plaintiff that Johnson met with Plaintiff in early March 2019, but assert he did so to inform Plaintiff that he

and Sanders had agreed to move Duncan to a different small group.[7] According to JumpStart Defendants, Plaintiff reacted negatively in a manner that suggested he was not ready to serve as a JumpStart peer leader/coach. [ECF No. 75-1 ¶ 24; ECF No. 75-2 ¶ 18]. Plaintiff demanded to have Duncan stay in his small group, and he refused to respect JumpStart's authority in making the decision to move Duncan to a different small group. *Id.* Thereafter, Johnson and Sanders agreed that Plaintiff was not ready to serve as a peer leader/coach based on his response to the situation, but that Plaintiff could continue in the program as a participant. [ECF No. 75-1 ¶ 26–27; ECF No. 75-2 ¶ 19–20].

When Plaintiff was offered this choice, he "became agitated," accusing Johnson "of acting like so many 'other Christians' who had treated him differently based on his apparently having been diagnosed with gender dysphoria or some other gender identity issue." [ECF No. 75-2 ¶ 20]. JumpStart Defendants state this was the first time Johnson or anyone at JumpStart had ever heard of Plaintiff's diagnosis. [ECF No. 75-2 ¶ 20; ECF No. 75-1 ¶ 29]. In every interaction with Sanders, Plaintiff presented himself

---

[7] Plaintiff argues that if this were true, he would not have been summoned alone to the back office of the chaplaincy concerning "a mundane roster change," away from witnesses, and he would not have been informed via two JumpStart representatives, as opposed to a second-year coach or the outside volunteer supervisor. [ECF No. 88-2 ¶¶ 1, 7].

as a male and never said anything to the contrary. [ECF No. 75-1 ¶ 29; *see also* ECF No. 74-15 ¶ 29 (Epps attesting to the same)].

JumpStart Defendants assert Plaintiff rejected the choices offered and chose to leave the room and the class. [ECF No. 75-2 ¶ 20]. On March 6, 2019, Johnson sent an e-mail to Epps, copying Sanders, providing as follows:

> This email is to inform you that Steward Buchanon has been removed from Jumpstart. To be brief he was removed for not respecting authority which is a cornerstone of what Jumpstart hopes to teach and to be an example of for the men who participant in the program. It was brought to my attention by Inside Jumpstart leaders McKinney, Steven, and Hunt that Mr. Buchanon may have or was acting inappropriately with a participant in his Jumpstart group.[8] Mr. Buchanon was informed that it would be best for the small group and for the participant to be moved into another group. The reason for this move would be to ensure an unbiased assessment by his coach throughout the course of this class. With assessments being completed with the aide of inmate leadership within Jumpstart, it would set a bad example if the appearance of favoritism or bias was made toward a Jumpstart participant. This suggestions was met in a negative manner that is unbecoming of a Jumpstart coach.
>
> Mr. Buchanon was given two choices concerning the incident. I offered him the option to stay in the class but as a participant and not a coach or he could leave the class. At this point, he was agitated and proceeded to tell me how he thought of how poorly fellow Christians treated people like him who are different— apparently he has been diagnosed with gender dysphoria or some other gender identity issue—it was at this point that I pointed

---

[8] Plaintiff argues this evidence indicates he was discriminated against based on his homosexual activities, as opposed to his transgender status, and maintains that "the final action[]" against Plaintiff, presumably the March 13, 2019 meeting, did not occur until after he "complained of a civil rights violation to Defendant Johnson." [ECF No. 99-2 at 23].

out that his comments, tone, and attitude at that moment were prime examples as to why he should not be a coach any longer in Jumpstart and that it was his defiance of the leadership over him in Jumpstart that was the impetus to my conversation with him today. He agreed and then left the room.

I want to make clear that Mr. Buchanon did not in any way make me feel uncomfortable. He did not curse at me. He did not act aggressively. Nor did he treat me in a way that I would take as disrespectful. I recognize that he was upset and possibly embarrassed. The purpose of this letter to you is not to have Mr. Buchanon "written up" or disciplined in any way but to let you know why the decision was made and the grounds on which it was made.

[ECF No. 75-2 ¶ 21, *id.* at 7].

According to JumpStart Defendants, even though Plaintiff left the JumpStart program in March 2019, he retained his status as a blue folder graduate of the program. [ECF No. 75-1 ¶ 32; ECF No. 75-2 ¶ 23]. However, in July 2019, Plaintiff received a major disciplinary citation for threatening to harm a SCDC employee. [ECF No. 75-1 ¶ 33, *id.* at 14, ECF No. 75-2 ¶ 24]. Based on the citation, JumpStart downgraded Plaintiff's status in the program from pass to fail, or from blue to red. [ECF No. 75-1 ¶ 33; ECF No. 75-2 ¶ 24]. According to JumpStart Defendants, even though JumpStart downgraded Plaintiff from pass to fail, Plaintiff can still go back through and successfully complete the discipleship program to re-attain his passing status, either a green or blue folder. [ECF No. 75-1 ¶ 34; ECF No. 75-2 ¶ 25].

16

Plaintiff's next parole hearing date is unknown, but it can occur no earlier than February 10, 2023. [ECF No. 74-14 ¶¶ 4–5]. Plaintiff "has had regular parole hearings over the years, all of which have been denied" since January 12, 1983. *Id.* ¶¶ 3–4.[9]

F.    Procedural History

In January 2020, Plaintiff filed an administrative grievance concerning the issues presented in this case. [ECF No. 1-3 at 5]. Plaintiff appealed the denial of that grievance in February 2020. *Id.* at 7. Plaintiff then challenged the denial of his appeal in the South Carolina Administrative Law Court ("ALJ"). *Id.* at 8. In order issued on October 29, 2020, the ALJ stated in part as follows:

> Prisoners have a right protected under the First Amendment to be free from retaliation by prison officials after filing a prison grievance. *Booker [v. South Carolina Department of Corrections*, 855 F.3d 533, 545 (2017)]. Therefore, Appellant's claim of misconduct against the Department, if proven, has its remedy under a federal § 1983 action . . . . Because Appellant has not alleged the infringement of a state-created liberty or property interest, it is appropriate to dismiss this appeal. Therefore, this Court will grant Respondent's Motion to Dismiss. Appellant's claim is more properly heard in federal court.

---

[9] Plaintiff has also submitted evidence indicating that the JumpStart program discriminates against Muslims. [*See* ECF No. 70-2]. However, Plaintiff does not, and cannot, bring suit on behalf of other inmates and cannot assert claims based on discrimination against a group that he is not a member. The undersigned notes a Muslim inmate at PCI has a suit currently pending in this court against JumpStart. *See Skipper v. Jumpstart*, C/A No. 4:20-4146-TLW-TER (Nov. 30, 2020).

*Id.* at 3.

Plaintiff filed the instant suit on February 5, 2021. [ECF No. 1]. Thereafter, JumpStart Defendants filed a motion to dismiss, arguing they are not state actors; thus, Plaintiff's claims "premised on 42 U.S.C. §§ 1983, 1985, and 1986 for purported violations of Plaintiff's rights under the First and Fourteenth Amendments of the U.S. Constitution and South Carolina Constitution" cannot proceed against them. [*See* ECF No. 21 at 3]. The district judge adopted the undersigned's recommendation to deny JumpStart Defendants' motion to dismiss. [*See* ECF Nos. 44, 100].

## II.     Discussion

### A.     Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents,

18

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.,* 901 F.2d 387 (4th Cir. 1990).

B.    Analysis

Plaintiff has sued SCDC and JumpStart Defendants, asserting ten causes of action. [*See* ECF No. 1-1 ¶¶ 51–61]. Primarily, Plaintiff asserts the following constitutional violations, brought pursuant to 42 U.S.C. § 1983: First Amendment Establishment Clause violation, First Amendment Retaliation, and Fourteenth Amendment Equal Protection violation. Plaintiff also asserts a conspiracy to commit the same, brought pursuant to 42 U.S.C. §§ 1985 and 1986. Finally, Plaintiff references the South Carolina constitution and certain statutes.

1.    Plaintiff's Standing to Sue

Both SCDC and JumpStart Defendants have challenged Plaintiff's standing to bring this lawsuit. Therefore, the court must address this issue before it can consider the merits of Plaintiff's constitutional claims. *See Whitmore v. Arkansas,* 495 U.S. 149, 154 (1990) ("[B]efore a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.").

"Article III of the Constitution provides that federal courts may consider only '[c]ases' and '[c]ontroversies.'" U.S. Const. art. III, § 2. Thus, "a plaintiff seeking relief in federal court must first demonstrate that he has

standing to do so, including that he has a personal stake in the outcome[.]" *Gill v. Whitford*, 138 S.Ct. 1916, 1923 (2018) (citation omitted).

To establish standing, "[t]he plaintiff must have (1) suffered an injury[-]in[-]fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). An injury-in-fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 339 (citations omitted). In questions concerning standing, the court "view[s] the evidence in the light most favorable to [the plaintiff] and draw[s] all reasonable inferences in his favor." *United States v. Phillips*, 883 F.3d 399, 405 (4th Cir. 2018).

SCDC Defendants argue as follows:

> Plaintiff's contention that he has sustained a constitutional injury by being deprived of housing and employment opportunities through JumpStart is, at its core, fictional for the simple reason Plaintiff has never been granted parole, and it is unknown whether he will ever make parole, whether during his next scheduled parole hearing or at some undetermined future date.

[ECF No. 74-1 at 5 (citing 74-14 ¶ 5 ("The Department of Probation, Parole, and Pardon Services sets parole dates, so it is unknown at this time when inmate Buchanan's next parole hearing will actually take place. It is also

unknown whether, as with each prior time, inmate Buchanan will be denied parole.")]. Likewise, JumpStart Defendants argue "[t]he *only* harm Plaintiff has alleged in his Complaint involves the purported impact on his employment and housing opportunities after his release from prison," and "[b]ecause the harm Plaintiff has alleged assumes (1) he will be released from prison, which is in no way guaranteed, and (2) he will not go back through and pass the JumpStart program between now and his potential release, which is similarly hypothetical, his claims are not yet ripe for adjudication." [ECF No. 75-3 at 15, 17 (emphasis in original)].[10]

SCDC and JumpStart Defendants are correct that to the extent Plaintiff complains of impact to his prospects, post-parole, he lacks standing to assert claims based on such "conjectural or hypothetical," versus "particularized and concrete," injuries. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citation omitted). Thus, Plaintiff lacks standing to assert claims concerning housing or employment opportunities allegedly to be provided by JumpStart at some unknown future time.

However, Plaintiff also alleges Epps discriminated against him by banning him from using the chaplaincy offices and equipment and,

---

[10] Plaintiff, in briefing, argues he has been harmed, in part, when his employment with JumpStart was terminated. [*See* ECF No. 86-2 at 10–11]. Plaintiff also repeatedly argues SCDC and JumpStart Defendants' actions have caused "injury to his civil rights." *Id.*

thereafter, Epps, Sanders, Johnson, and Beard discriminated and retaliated against him when he complained of Epps' original discrimination via grievance by dismissing him from the JumpStart program, including his position as a peer leader/coach. The court finds these allegations satisfy the Article III standing requirement. *See, e.g., Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) ("Discriminatory treatment . . . qualif[ies] as an actual injury for standing purposes. Moreover, plaintiffs in discrimination cases may seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the disfavored group or by denying benefits to the favored group.. . . . This level playing field analysis, though typically seen in equal protection cases, also applies in First Amendment cases.") (citations omitted)); *American Civil Liberties Union, Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper."); *Abdulhaseeb v. Saffle*, 65 F. App'x 667, 673 (10th Cir. 2003) ("The Supreme Court has stated that the denial of equal protection *is itself* the injury required to bring such a claim. 'The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate ability to obtain the

benefit.'") (citing *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)); *Vazquez v. City of New York*, No. 21 CIV. 1573 (PAE), 2021 WL 1966397, at *5 (S.D.N.Y. May 17, 2021) ("The claims that Vazquez appears to have standing to assert, and which could conceivably give rise to viable claims under § 1983, include the following: . . . . he lost his law library job and was transferred in retaliation for filing complaints and grievances . . . ."); *Crowder v. Diaz*, 2019 WL 3892300 (E.D. Cal. Aug. 19, 2020), report and recommendation adopted, 2019 WL 5566433 (E.D. Cal. Oct. 29, 2019) (denying motion to dismiss equal protection claim against defendant who denied plaintiff a job at the prison library based on plaintiff's transgender status).[11]

Accordingly, the undersigned recommends the district judge deny SCDC and JumpStart's motions for summary judgment based on Plaintiff's lack of standing as to his federal claims for violation of his First and Fourteenth Amendment rights.

---

[11] SCDC and JumpStart Defendants do not address Plaintiff's assertion that he was injured when he lost his position as a peer leader/coach except beyond asserting this argument "is factually misplaced" in that the position is "an unpaid, volunteer position" and "not employment role in any sense of the phrase." [ECF No. 75-3 at 15 n.1; *see also* ECF No. 93 at 4 ("To the extent Plaintiff's alleged harm is tied to his removal from serving as a peer leader/coach role in JumpStart's discipleship program, there is no property interest whatsoever in that role.")]. However, neither SCDC nor JumpStart Defendants cite case law indicating that whether a position is paid or unpaid impacts the standing analysis as articulated above.

2.     Exhaustion of Administrative Remedies

SCDC and JumpStart Defendants argue Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), specifically 42 U.S.C. § 1997e(a). Section 1997e(a) provides "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To satisfy this requirement, a plaintiff must avail himself of every level of available administrative review. *See Booth v. Churner*, 532 U.S. 731 (2001). Those remedies neither need to meet federal standards, nor are they required to be plain, speedy, and effective. *Porter*, 534 U.S. at 524.

Satisfaction of the exhaustion requirement requires "using all steps that the agency holds out, and doing so *properly*." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original)). Thus, "it is the prison's requirements, and not the [PLRA], that define the boundaries of proper exhaustion." *Jones v. Bock*,

549 U.S. 199, 218 (2007). Defendants have the burden of establishing that Plaintiff failed to exhaust his administrative remedies. *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 683 (4th Cir. 2005). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see also Ross v. Blake*, 136 S. Ct. 1850 (2018).

SCDC's grievance system involves a three-step process which is mandatory. [ECF No. 74-4 ¶¶ 7, 17]. First, except in cases not applicable here, an inmate must attempt to resolve the issue through informal resolution by submitting a Request to Staff Member Form ("RTSM") or Automated Request to Staff Member Form ("ARTSM") within eight working days of the incident. *Id.* ¶ 7. After a response to the RTSM is received or the time for response has elapsed, the inmate may file a Step 1 grievance. *Id.* ¶¶ 10–11. When the Step 1 grievance is processed and if the inmate is unsatisfied with the response, the inmate must appeal by filing a Step 2 grievance within five calendar days of the response. *Id.* ¶ 14. The response to the Step 2 grievance is considered the agency's final decision on the issue. *Id.* ¶ 15.

Here, it appears the parties agree that Plaintiff exhausted his administrative remedies as to some of his claims. The operative Step 1 grievance in this case, PCI-0043-20, is dated January 13, 2020, but appears to have been filed on January 16, 2020, and provides as follows:

"STEWARD, I UNDERSTAND YOU IDENTIFY AS TRANSGENDER . . . AND, YOU'VE FILED A COMPLAINT IN COLUMBIA AGAINST CHAPLAIN EPPS."

These facts were known at Perry only to Chaplain Epps. (See KIOSK, ARTSM #19-01171346 &19-01173676). These words were used by Chaplain Epps to inflame the religious bigotry of Jump Start, Inc. These words were used to rescind my most-elite, Jump Start graduate status of "blue folder." These words were used to terminate my employment with Jump Start, Inc. as an inmate volunteer "Jump Start Coach." These words were used by Jump Start officials to permanently disqualify me from ever entering into their promised landlord-tenant relationship and receiving the promised tens or thousands, if not hundreds of thousands of dollars worth of low-rent housing, guaranteed job placement, individual and group counseling, and various other services. These words were used to publicly shame and humiliate me, destroying the practical validity and viableness of my individual, personal ministry of spiritual healing and encouragement with other inmates, toward which I had worked so long and hard, by publicly branding me as unworthy and unacceptable as a prison community leader.

Senior Chaplain Epps, Volunteers Carey Sanders, Dave Johnson and Dr. [First Name Unknown] Beard each personally, individually and severally, successfully acted to violate, at bare minimum, my constitutionally secured rights to equal protection of the law, due process of the law, and protections against cruel and unusual punishment. Each of the aforementioned conspired together, and had a meeting of the minds, to carry out these actions which violated my constitutional rights. Senior Chaplain Epps and Mr. Carey Sanders were each in positions of authority,

with sufficient prior notice, to be responsible for stopping the violations complained of herein. (See, letter to Mr. Carey Sanders, dated 12/10/19, with affidavit of service, dated 12/13/19, consisting of 4 pages, attached hereto and by this reference made part hereof.)

These words represent Mr. Carey Sanders final statement in behalf of Jump Start, Inc., on 1/03/20. These words represent Senior Chaplain Larry Epps' final decision, denying my appeal of Mr. Sanders' decision.

I HEREBY GRIEVE CHAPLAIN EPPS' DECISION (ARTSM #20-01496420).

ACTION REQUESTED: Terminate Chaplain Epps' employment with SCDC. Permanently cancel above volunteers' permission to enter SCDC property. Require Jump Start, Inc. to publish LGBT/H (Lesbian, Gay, Bi-Sexual, Transgender/HIV) anti-discrimination policy within 90 days or cease and desist operating in SCDC until such is published and approved by SCDC and Grievant Buchanan. Complete transparency on all SCDC actions taken.

[ECF No. 74-9]. Williams denied Plaintiff's grievance, stating in part "[t]here is no evidence that Chaplain Epps and/or other staff or volunteers have engaged in activities that would justify their removal from SCDC." *Id.*

The first referenced ARTSM, #19-01171846, was filed February 24, 2019, and captioned as an ADA complaint, in which Plaintiff asserted he was diagnosed with gender dysphoria on October 10, 2018, and he has "suffered, and continue[s] to suffer, workplace discrimination" due to Epps, "as a direct and proximate result of my disability." [ECF No. 74-10]. The second referenced ARTSM, #19-01173676, was filed February 26, 2019, and was a

follow-up to the prior ARTSM response. [ECF No. 74-11]. Plaintiff asked if the individual who answered the prior ARTSM "thought the matter was going to be investigated as he requested." *Id.*

The third referenced ARTSM, #20-01496420, was filed on February 12, 2020, and provides as follows:

> Chaplain Epps, on Monday, 01/06/20, you revealed to me that Mr. Carey Sanders, Jump Start Inc., had asked your advice regarding the reversal of his 03/13/19 decision to rescind my Jump Start Blue Folder status and fire me from employ as a Jump Start Coach. You told me that you agreed to participate in this decision with him and asked him to E-Mail to you a copy of my 12/10/19 letter to him, which sat upon your desk. I understand that, on 01/08/20, Mr. Sanders rendered his decision to allow his 03/13/19 decision to stand upon the same reasons, and to not reinstate me. Even though you assisted Mr. Sanders in reaching this decision, it was his and Jump Start's decision. As Senior Chaplain at Perry, you can overrule Mr. Sander's decision, reinstate my Blue Folder Status, and re-employee me as a Jump Start Coach . . . . I appeal Mr. Sanders' decision to you. You and I have discussed this extensively over the last ten months. I do not want to talk about it any longer. I ask that you response to the ARTSM with either a Yes or No . . . .

[ECF No. 74-12]. Epps provided the following response: "No. I can't and won't override or overrule the leaders of any ministry here. That is just not the way I operate and I don't think would be right for me to do so. I love you but no, I can't do that." *Id.*

Plaintiff filed a timely Step 2 appeal on February 4, 2020. [*See* ECF No. 74-4 ¶ 33, ECF No. 74-13]. That appeal was denied on March 6, 2020. [ECF

29

No. 74-13]. Davis, in denying the appeal, stated "[t]here is no evidence to substantiate your allegations of staff negligence on the part of Chaplain Epps." *Id.*

> SCDC Defendants argue as follows:
>
> [E]ven though Plaintiff specifically stated within his Step 1 grievance that he was grieving Defendant Epps' "final decision[] denying [his] appeal of Mr. Sanders' decision," Plaintiff now brings claims against four SCDC Defendants and fourteen JumpStart defendants for violations of his First and Fourteenth Amendment rights, Title VII violations, Title VIII violations, civil conspiracy, and various provisions of state law. Yet, Plaintiff only grieved Defendant Epps' refusal to overturn Sanders' decision. By necessity this automatically excludes any claims pertaining to Defendants Stirling, Williams, or Davis.

[ECF No. 74-1 at 11]. JumpStart Defendants similarly argue "there can be no contention that Plaintiff filed a grievance with respect to any of the ten JumpStart Board Members who he has now dragged into this lawsuit (Defendants Scharff, Sulton, Caldwell, McDowell, Phillips, Fields, Hold, Kiriakides, Urban, and Moore)." [ECF No. 75-3 at 17–18].[12]

SCDC and JumpStart Defendants have not carried their burden to prove that Plaintiff failed to exhaust his administrative remedies. *See Jones*,

---

[12] JumpStart Defendants also argue, in the alternative, "Plaintiff did not file a grievance with respect to any action of JumpStart—only the action of Chaplain Epps in failing to overturn JumpStart's decisions." [ECF No. 75-3 at 17–18]. However, Plaintiff's Step 1 grievance states clearly that he has been harmed by the actions of Epps as well as Sanders, Johnson, and Beard. [*See* ECF No. 74-9].

549 U.S. at 211–212; *see also Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).[13]

SCDC and JumpStart Defendants have not indicated that Plaintiff was required to specifically name anyone in his grievances to exhaust his available administrative remedies. *See Moore*, 517 F.3d at 726 (declining to dismiss claim for failure to exhaust where defendants were not named or referenced in the relevant prison grievance, as nothing in the North Carolina Department of Corrections' administrative remedy procedure required the plaintiff to identify specific individual(s) in his grievance).

Instead, SCDC Defendants invoke SCDC's procedural rule that dictates inmates are "allowed to submit only one issue per incident or circumstances on each grievance form," appearing to argue that because Plaintiff stated in his Step 1 grievance that he grieved Epps' decision to terminate his association with JumpStart, no other claim but that decision has been exhausted. [ECF No. 74-1 at 9 (citing ECF No. 74-4 ¶ 16)]. However, affording Plaintiff the benefit of liberal construction of his pleadings, as the undersigned is required to do, the issue Plaintiff complained of in his Step 1

---

[13] Neither SCDC nor JumpStart Defendants provide argument or evidence as to which, if any, causes of action are barred due to Plaintiff's alleged failure to exhaust his administrative remedies.

grievance, as well as in this instant suit, is that he was discriminated and retaliated against by members of the JumpStart program and SCDC officials.

Plaintiff then filed the instant suit naming the same people as found in his Step 1 grievance, but also Stirling, as director of the SCDC with oversight of the JumpStart program; Williams and Davis, who denied his Step 1 and Step 2 grievances; and members of the JumpStart board, who Plaintiff alleges ignored him when he contacted them concerning the alleged discrimination. Plaintiff's claims are grounded in the discrimination and retaliation he alleges he faced, and his Step 1 grievance put both SCDC and JumpStart Defendants on notice as to the basis of his complaint. *See Jones*, 549 U.S. at 219 ("the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation.") (citation omitted).

Accordingly, the undersigned declines to recommend dismissal of these defendants based on Plaintiff's failure to exhaust.

### 3.    JumpStart Defendants as State Actors

A civil action brought pursuant to 42 U.S.C. § 1983 provides a means to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States, but the statute is not, itself, a

source of substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "Section 1983 imposes liability on any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983). "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997); *see also Cox v. Duke Energy Inc.*, 876 F.3d 625, 632 (4th Cir. 2017) ("[T]o be sued under § 1983, a defendant must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that [it] is engaged in the state's actions.") (citation omitted)).

"Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). No one factor is determinative of state action; rather, the state action must be determined by considering the totality of the circumstances. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 341–43 (4th Cir. 2000). Private

conduct, without state action, is not actionable under § 1983 and the United

States Constitution. *See Lugar*, 457 U.S. at 936.[14]

Historically, the Fourth Circuit "recognized four exclusive circumstances under which a private party can be deemed to be a state actor":

> (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.

*Andrews v. Federal Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir.

1993) (citations omitted). Subsequently, the Fourth Circuit recognized a more

flexible approach, stating, "[a]t bottom, the state action determination

requires an examination of all the relevant circumstances, in an attempt to

evaluate 'the degree of the Government's participation in the private party's

activities.'" *Goldstein,* 218 F.3d at 342 (citation omitted) (collecting cases); *see*

*also id.* at 343 ("In short, 'the Court has articulated a number of different

factors or tests in different contexts,' and the facts 'which would convert the

private party into a state actor [vary] with the circumstances of the case.'"

---

[14] This analysis likewise applies to claims brought pursuant to 42 U.S.C. §§ 1985 and 1986. *See, e.g., Curtis v. Ziteke*, C/A No. 3:21-420-CMC-PJG, 2021 WL 1795695, at *1 (D.S.C. Apr. 12, 2021), report and recommendation adopted, C/A No. 3:21-420-CMC, 2021 WL 1791174 (D.S.C. May 5, 2021).

(citing *Lugar*, 457 U.S. at 939)). As noted by the Supreme Court, "the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349–50 (1974).

As stated, South Carolina established the Offender Employment Preparation Program, pursuant to which SCDC is directed "[t]o aid incarcerated individuals with reentry . . . ." SCDC and JumpStart entered into a MOU that stated JumpStart would "provide[] certain services including discipleship, re-entry workshops, employment readiness activities, and other programs to assist incarcerated individuals prepare for and successfully reentry their communities," but also that "JumpStart agrees that it and its volunteers and employees must comply with all policies and procedures of SCDC and all federal, state, and local laws, ordinances, regulations, and accreditation standards." [*See* ECF No. 40-2]. Although the MOU makes clear that JumpStart employees and volunteers are not SCDC employees, the MOU also provides that SCDC chaplains will be responsible for "[m]onitoring . . . Jumpstart services," and "[o]verall oversight of Jumpstart services will be provided by a designated liaison . . . whose responsibility it is to oversee and ensure compliance with the terms of this MOU." *See id.*

JumpStart Defendants do not address the Offender Employment Preparation Program, the MOU, or Plaintiff's version of events, and instead, turning to case law concerning prison chaplains, argue that "Federal courts considering the issue have carved out as non-state action all decisions by prison chaplains—even full-time employees of the State—that are ecclesiastical in nature." [ECF No. 75-3 at 13–14 (citing *Montono v. Hedgepeth*, 120 F.3d 844, 851 (8th Cir. 1997) (holding "a prison chaplain, even if a full-time state employee, is not a state actor when he engages in inherently ecclesiastic functions," such as excommunicating an inmate for violation of church law and prohibiting him from attending religious services)]. JumpStart Defendants argue the decisions (1) to remove Plaintiff from his role as a peer leader/coach because of his response to having Duncan removed from his small group and (2) to remove Plaintiff from the program following a major disciplinary action were "ecclesiastical in nature and cannot constitute state action as a matter of law." *Id.* at 14–15.

Determining whether a private party's action is fairly attributable to the state requires the court to begin by identifying the specific conduct of which the plaintiff complains. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982) ("Faithful adherence to the 'state action' requirement . . . requires careful

attention to the gravamen of the plaintiff's complaint."); *see also Blum*, 457 U.S. at 1002 (treating § 1983's "color of law" requirement as the equivalent to the "state action" requirement under the 14th Amendment). Here, the specific conduct of which Plaintiff complains centers on Epps, Sanders, Johnson, and Beard's removal of him from the JumpStart program, including not allowing him to continue to be a coach, allegedly due to his transgender or homosexual status and in retaliation for having filed a grievance against Epps.

The difficulty is the hybrid nature of the JumpStart program. Plaintiff's position is that he was excluded from a rehabilitation program, albeit a religious one, a program formed subject to the direction of the South Carolina legislature and overseen by SCDC. [*See* ECF No. 99-2 at 1 (". . . he was disqualified and disfranchised by JumpStart defendants from participating in the South Carolina 'Offender Employment Preparation Program . . .'")]. On the other hand, JumpStart Defendants focus on the religious aspects of the JumpStart program, arguing that "[w]hile not prison chaplains, the JumpStart representatives who interact with inmates through the inside ministry/discipleship program are absolutely serving in a faith-based leadership role that is akin to a chaplain/pastor." [ECF No. at 75-3 at 14].

37

The Supreme Court has concluded, in the prison context, that private individuals who contract with the state to provide services to inmates can, in some circumstances, be considered state actors. For example, a physician under contract to provide medical services to inmates was a state actor for purposes of 42 U.S.C. § 1983. *West v. Atkins*, 487 U.S. 42, 55–56 (1988).[15] Other courts, consistent with the direction found in *West*, have held 42 U.S.C. § 1983 liability can attach where the state has delegated its duty to transport prisoners, *Dykes v. Inmate Servs. Corp.*, C/A No. 9:14-3609-RMG, 2017 WL 496065, at *3 (D.S.C. Feb. 7, 2017); provide food services, *Lewis v. Mitchell*, 416 F. Supp. 2d 935, 947 (S.D. Cal. 2005); monitor drug use, *Amig v. Cty. of Juniata*, 432 F. Supp. 3d 481, 487 (M.D. Pa. 2020); and provide mail screening service, *Hill v. Pennsylvania Dep't of Corr.*, No. 684 M.D. 2018, 2022 WL 480200, at *6 (Pa. Commw. Ct. Feb. 17, 2022). As stated by the Fourth Circuit:

> We have also recognized that, subject to certain limitations, the government may "delegate its authority [to private entities] to incarcerate, to confine, to discipline, to feed, and to provide medical and other care to inmates who are imprisoned by order of

---

[15] As held by the Fourth Circuit, whether a physician providing medical care to prisoners is working pursuant to an actual contract with the prison is not dispositive as to the state actor issue. *See Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994) (holding "that a physician who treats a prisoner acts under color of state law even though there was no contractual relationship between the prison and the physician").

the federal government." *Holly v. Scott*, 434 F.3d 287, 297 (4th Cir. 2006). *See also Rosborough v. Management & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (recognizing prison operation as a "fundamentally governmental function" which may nevertheless be "delegated to private entities.").

*Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 162 (4th Cir. 2018).

Plaintiff argues "Stirling delegated his statutory duty to provide re-entry training and services for inmates under his control to a religious organization . . . ." [ECF No. 86-2 at 11], and there is case law to support Plaintiff's position:

> Although RSAT applicants volunteered to enter the non-constitutionally mandated rehabilitation program, and the program was run by a contract provider (Gateway), the result is no different here than in *West*, *supra*. In this instance, the Commonwealth outsourced the substance abuse treatment program it sought to provide to its inmate population to Gateway. Gateway's services were offered exclusively within the confines of the prison walls. . . . Gateway, at least within the prison setting, was performing a rehabilitative service to an incarcerated population, a service that has traditionally been in the exclusive prerogative of the State. Gateway and its employees are state actors, acting under color of law for purposes of § 1983 when undertaking their duties in treating Plaintiff's substance abuse problems.

*Rauch v. Dep't of Corr. of Pennsylvania*, C/A No. 3:CV-04-2216, 2007 WL 4198425, at *6 (M.D. Pa. Nov. 20, 2007); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1940 (2019) (Sotomator, J., dissenting) ("When a government (1) makes a choice that triggers constitutional

obligations, and then (2) contracts out those constitutional responsibilities to a private entity, that entity—in agreeing to take on the job—becomes a state actor for purposes of § 1983."); Ivan E. Bodensteiner and Rosalie Berger Levinson, State and Local Government Civil Rights Liability § 1:4 ("Generally, where the government contracts out official functions that implicate statutory or constitutional duties, state action will be found") (collecting cases).

However, the instant case is unlike the cases cited above. SCDC did not outsource its responsibility "to aid incarcerated individuals with reentry into their communities" solely to JumpStart, and therefore, although Plaintiff argues otherwise, he has not been excluded from the Offender Employment Preparation Program, only the JumpStart program. Epps has submitted evidence, which Plaintiff does not dispute, that JumpStart is one of a number of organizations that provide housing and employment opportunities to inmates at PCI and in South Carolina. [*See* ECF No. 74-15 ¶¶ 6–9]. Here, Plaintiff had a choice of resources, unlike the above cases. *See, e.g., Conner*, 42 F.3d at 225 ("the state authorizes the physician to provide medical care to the prisoner, and the prisoner has no choice but to accept the treatment offered by the physician"); *Janny v. Gamez*, 8 F.4th 883, 909 (10th Cir. 2021) (collecting cases and finding Establishment Clause violations where, in part,

40

inmates are not offered options beyond religious-based NA and AA programs as a condition of parole).[16]

The instant case also stands in contrast to others where courts have found religious groups providing rehabilitation services in prisons to be state actors for purposes of 42 U.S.C. § 1983 liability. For example, in *Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406 (8th Cir. 2007), the Eighth Circuit reviewed the religious focus of InnerChange, an organization that worked within one of the state prisons in Iowa.[17] The court noted the privileges afforded to inmates who participated in InnerChange's program, including the ability to use computers, see family more often, and have cells with more privacy, further noting InnerChange's staff "possess many of the same duties as corrections personnel." *Id.* at 416, 424. Additionally, "the Iowa legislature made specific appropriations from public funds 'for a values-based treatment program at the Newton correctional facility' *when InnerChange solely provided the program*," and the Iowa Department of Corrections funded 30–40% of

---

[16] Although Plaintiff argues, without support, that the JumpStart program is "the largest and most well-resourced organization in [the] state that could provide comprehensive support to him," [ECF No. 99-2 at 4], there is no evidence currently before the court concerning this issue.

[17] There are significant similarities between InnerChange program and the JumpStart program.

InnerChange's operating costs during the relevant time period. *Id.* at 418, 420 (emphasis added).

The *Americans United* court held the defendants in violation of the Establishment Clause, holding also in relevant part as follows:

> . . . the alleged deprivation is a violation of the Establishment Clause. This violation is possible because of privileges created by the DOC in its contracts with Prison Fellowship and InnerChange. The DOC gave Prison Fellowship and InnerChange access to facilities, control of prisoners, and substantial aid to effectuate the program. Thus, the privilege to Prison Fellowship and InnerChange was created by the state . . . . In this case, the state effectively gave InnerChange its 24-hour power to incarcerate, treat, and discipline inmates. InnerChange teachers and counselors are authorized to issue inmate disciplinary reports, and progressive discipline is effectuated in concert with the DOC. Prison Fellowship and InnerChange acted jointly with the DOC and can be classified as state actors under § 1983.

*Id.* at 422–23.

Here, JumpStart is a privately-funded volunteer organization, attendance in the JumpStart program is not required, and it is one of many entities providing services to inmates. SCDC gave JumpStart access to it facilities, but did not provide JumpStart with control over the inmates or any aid, much less substantial aid, to effectuate the program. Also, there is no evidence in record that JumpStart had power to incarcerate, treat, or discipline inmates, nor that any such power was "effectuated in concert" with SCDC.

As the Fourth Circuit has stated, regardless under what theory state action is examined,

> *Brentwood* teaches that the totality of the circumstances in this setting is determinative and that all roads lead back to a finding of state action "if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may fairly be treated as that of the State itself.'" Emphasizing the same point a different way, the majority opinion stated that "[t]he judicial obligation is . . . to assure that constitutional standards are invoked 'when it can be said that the State is responsible for the specific conduct of which the plaintiff complains . . . .'"

*Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 184 (4th Cir. 2009) (citing *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 2295 (2001).

Here, the evidence taken in light most favorable to Plaintiff does not indicate the state is responsible for the conduct about which he complains. Although Plaintiff repeatedly argues that he was discriminated and retaliated against by Epps, Sanders, Johnson, and Beard, he has failed to submit any admissible evidence substantiating his allegations that Epps, as a SCDC employee, was involved in the decision to have Plaintiff removed from the JumpStart program, much less that Epps directed his removal. *Blum*, 457 U.S. at 1004 (holding state action is present if the state has ordered the private conduct or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed

43

to be that of the State"); *DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999) ("Thus, the Supreme Court has held that private activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it into state action: 'Mere approval of or acquiescence in the initiatives of a private party' is insufficient.") (citations omitted)); *Jackson v. Pantazes*, 810 F.2d 426, 429 (4th Cir.1987) (finding bail bondsman to be a state actor, because he obtained "significant aid" from a police officer in arresting the plaintiff, noting "symbiotic relationship" between bail bondsmen and the Maryland criminal court system).

Taking into account the totality of the circumstances, the actions complained of, taken by select JumpStart Defendants, do not represent the necessary "close nexus" to the State. *See Lugar*, 457 U.S. at 936 (holding purely private conduct, no matter how wrongful or discriminatory is not actionable under 42 U.S.C. § 1983).

Finally, as previously discussed by the undersigned, courts have repeatedly held actions taken by prison chaplain that are ecclesiastical in nature fall outside the scope of 42 U.S.C. § 1983, although courts disagree exactly where that line is drawn. [*See* ECF No. 44 at 10–21]. The court need not address this issue because, based on a more fulsome record than when the court addressed this issue previously, Plaintiff makes no argument and

offers no evidence that he is unable to participate in religious services or practice his religious at PCI, only that he is unable to participate in the JumpStart program, rendering the "ecclesiastical" line of cases inapposite. *See, e.g.*, *Phelps v. Dunn*, 965 F.2d 93, 102 (6th Cir. 1992) (holding volunteer chaplain qualified as state actor where he barred the prisoner because of his sexual orientation from participating in religious services "or even enter the chapel," inconsistent with a contract, the warden's ruling, and prison policy); *Kahn v. Barela*, C/A No. 15-1151 MV/SMV, 2020 WL 5977930, at *9 (D.N.M. Oct. 8, 2020) (holding employees of a private non-profit called Good News Jail and Prison Ministry to be "acting under color of state law" where the plaintiff alleged that he, as a Muslim inmate, was not allowed a reasonable opportunity to practice his religion, in contrast to Christian inmates).

Here, JumpStart Defendants' actions are not fairly attributable to the state. Additionally, as for JumpStart itself, it is not a "person" subject to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, the undersigned recommends granting JumpStart Defendants' motion for summary judgment as to Plaintiff's federal claims.[18]

---

[18] To the extent Plaintiff's First Amendment Establishment Clause claim survives the above recommendation, this claim is also subject to dismissal for many of the reasons stated above. [*See* ECF No. 1-1 ¶ 60]. SCDC's utilization of JumpStart among other entities to provide rehabilitative services, under these circumstances, does not send a message of government endorsement of

### 5.   Defendant Epps

Plaintiff has submitted evidence that Epps "banned Plaintiff from using Perry Chaplaincy officers and equipment for his regular prison job as Recreation Liaison," after he "learned of Plaintiff's having lived openly as transgender between 2004 and 2008." [ECF No. 1-1 ¶ 36]. Plaintiff alleges that after Duncan's arrival, he began to spend time with Duncan, and "[t]hat is what drew Defendant Epps' attention and brought to him the previously untold story that I am a male to female transgender individual." [ECF No. 88-2 ¶ 4].

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, (1985). To establish an equal protection claim, a plaintiff "'must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination' . . . . If he makes this showing, 'the

---

a religious activity, *County of Allegheny v. ACLU*, 492 U.S. 573, 592–94 (1989); coerce participation in a religious activity, *Lee v. Weisman*, 505 U.S. 577, 587 (1992); or excessively entangle the government in a religious activity, *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971).

court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).

Plaintiff's limited allegations are insufficient to establish he was treated differently from others with whom he was similarly situated. To survive SCDC Defendant's motion for summary judgment, Plaintiff must assert "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003) (King, J. dissenting) (citing *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001)). "[M]ere conclusory assertions" of discriminatory intent are insufficient. *Id.*; *see also Pronin v. Johnson*, 628 F. App'x 160, 164 (4th Cir. 2015) (same).

Plaintiff offers no more than his own conclusory and vague allegations that he was treated differently by Epps based on his transgender status. In contrast, Epps has offered sworn testimony that Plaintiff was excluded from the chaplaincy office due to ongoing disputes between him and Epps concerning his attitude. [ECF No. 74-15 ¶ 27].

Accordingly, the undersigned recommends granting SCDC Defendants' motion for summary judgment as to Plaintiff's claim against Epps for violation of his Fourteenth Amendment Equal Protection claim.

6.     Defendants Williams and Davis

SCDC Defendants argue the only allegations pertaining to Williams and Davis relate to their ministerial roles in responding to Plaintiff's Step 1 and Step 2 grievances, and, therefore, Plaintiff has failed to state a claim for relief that may be granted against them.

"To establish personal liability under § 1983, . . . the plaintiff must 'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights.'" *Williamson v. Stirling*, 912 F.3d 154, 170 (4th Cir. 2018) (citing *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). In other words, "the official's 'own individual actions' must have 'violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Plaintiff appears to argue that Williams and Davis should be held liable because they knew what happened to him through his grievances and did nothing to correct the situation. [*See* ECF No. 1-1 ¶ 45]. This is insufficient to state a claim against these defendants. *See, e.g., Ford v. Stirling*, C/A No. 2:17-02390-MGL, 2017 WL 4803648, at *2 (D.S.C. Oct. 25, 2017) ("As other Courts have held, an official's response to a prisoner's after-

the-fact grievance does not provide a basis for a Section 1983 claim.") (collecting cases)).[19]

Accordingly, the undersigned recommends granting SCDC Defendants' motion for summary judgment, dismissing Williams and Davis from this case.[20]

### 7. Injunctive Relief

Plaintiff states Stirling "is being sued in his official capacity for prospective injunctive relief only." [ECF No. 1-1 ¶ 24; *see also id.* ¶¶ 63–64 ("A preliminary and permanent injunction ordering Defendant Stirling and his successor to cease and desist in perpetuity all JumpStart program and related activities . . . . A preliminary and permanent injunction ordering [JumpStart Defendants] to cease and desist . . . using . . . system to deny anyone employment or housing opportunities . . . .")].

---

[19] To the extent that Plaintiff argues Epps violated his constitutional rights "a second time" by not overturning Sanders' decision to not reinstate him as a coach, his claims fails for the same reason as stated above. [ECF No. 1-1 ¶ 58]. No further claims against Epps survive SCDC Defendants' motion for summary judgment where Plaintiff has failed to submit admissible evidence that Epps was involved in the decision to remove him from the JumpStart program.

[20] Further, as Plaintiff has failed to submit any evidence of a constitutional violation pursuant to 42 U.S.C. § 1983, he has similarly failed to submit any evidence of a conspiracy to violate his rights pursuant to 42 U.S.C. §§ 1985, 1986. *See generally Simmons v. Poe*, 47 F.3d 1370, 1376–77 (4th Cir. 1995). Given this and the above recommendations, it is unnecessary to address SCDC Defendants' additional arguments that they are entitled to Eleventh Amendment immunity and qualified immunity.

To obtain a preliminary injunction, the plaintiff must demonstrate "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council., Inc.*, 555 U.S. 7 (2008). As discussed above, Plaintiff has not shown he is likely to succeed on the merits. Accordingly, the undersigned recommends the district judge deny Plaintiff's request for injunctive relief.[21]

### 8.    State-Law Claims

To the extent Plaintiff raises any state law claims, the court need not reach them. If the district judge accepts the recommendations made, the original federal jurisdiction claims will be dismissed. The Fourth Circuit has

---

[21] Plaintiff argues, based on the proceedings before the ALJ and the report and recommendation previously issued by the undersigned, certain facts or legal issues in this case have been decided and SCDC and JumpStart Defendants are bound by those decisions. [*See, e.g.*, ECF No. 86-2 at 1 ("This is an action to enforce an unappealed final agency adjudication"); 2 ("They have waived the defenses listed in their motions for summary judgment. Their claims are barred by the doctrines of waiver, res judicata, administrative estoppel, record estoppel, estoppel by silence, laches and stare decisis"), 3 ("Magistrate Hodges' findings of fact and conclusions of law became final July 7, 2021"); 9 ("these defendants could have raised these factual issues during the Inmate Grievance process, as was their right, or raised the factual and defensive claims before the ALJ or on appeal from the ALJ's order, as was their right. They waived these rights . . . .")]. Review of Plaintiff's arguments and the applicable case law reveal that Plaintiff's arguments are without merit. [*See also* ECF No. 96 at 1–6].

recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims); *see also* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966). Therefore, the undersigned recommends the district judge decline to retain jurisdiction over any remaining state law claims.

### 9.    Plaintiff's Motions

The undersigned recommends the district judge deny Plaintiff's motion for summary judgment where it consists solely of a two-page notarized affidavit, asserting facts relevant to his claims, but asserting no argument in support. [*See* ECF No. 88-2].[22]

The undersigned denies Plaintiff's motion to compel JumpStart Defendants to produce additional discovery where he did not object that he has received adequate discovery on the issue of whether JumpStart

---

[22] Plaintiff's reply to his motion for summary judgment provides both argument and evidence in support of his claims. [*See* ECF No. 99]. To the extent Plaintiff is permitted to assert arguments in support of summary judgment in his reply, the undersigned recommends dismissal of his motion for the reasons discussed in addressing SCDC and JumpStart Defendants' motions for summary judgment.

Defendants are state actors and where that issue is dispositive as to JumpStart Defendants' liability, as discussed above. [ECF No. 70].

The undersigned denies Plaintiff's motion to compel SCDC Defendants to produce additional discovery, where he seeks certain SCDC policies, and where SCDC Defendants represent that "per SCDC policy, inmates are not allowed to possess copies of SCDC policies" and where the policies sought are "available in the institutional Law Library." [ECF Nos. 71, 78].

The undersigned denies Plaintiff's motion to appoint a guardian ad litem pursuant to Fed. R. Civ. P. 17(c). [ECF No. 73]. This rule provides in part that "[t]he court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action." Fed. R. Civ. P. 17(c). However, there is no indication in the record that Plaintiff is a minor or incompetent.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned denies Plaintiff's motions to compel and motion to appoint a guardian [ECF Nos. 70, 71, 73] and recommends the district judge deny Plaintiff's motion for summary judgment [ECF No. 88] and grant SCDC and JumpStart Defendants' motions for summary judgment [ECF Nos. 74, 75].

IT IS SO RECOMMENDED AND ORDERED.

March 2, 2022                         Shiva V. Hodges
Columbia, South Carolina             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).